IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:09-CV-82-FL

KATHERINE SMITH,                        )
    Plaintiff,                          )
                                )
           v.                             )
                                )        **MEMORANDUM &**
                                )        **RECOMMENDATION**
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
    Defendant.                          )
                                )

      This matter is before the Court upon the parties' cross Motions for Judgment on the

Pleadings (DE's 19 & 26). The time for the parties to file any further responses or replies has

expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. 636(b)(1), this

matter is before the undersigned for the entry of a Memorandum and Recommendation. For the

following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings

(DE-19) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-26) be

GRANTED, and that the final decision by Defendant be AFFIRMED.

### Statement of the Case

      Plaintiff applied for Disability Insurance ("DIB") and Supplemental Income Benefits ("SSI")

on June 17, 2004, alleging that she became unable to work on September 20, 2001 (Tr. 18). This

application was denied initially and upon reconsideration (Tr. 18). A hearing was held before an

Administrative Law Judge ("ALJ"), who found Plaintiff was not disabled during the relevant time

period in a decision dated December 6, 2006 (Tr. 18-28). The Social Security Administration's

1

Office of Hearings and Appeals ("Appeals Council") denied Plaintiff's request for review on March 27, 2009, rendering the ALJ's determination as Defendant's final decision (Tr. 6-9). Plaintiff filed the instant action on May 19, 2009 (DE-5).

## Standard of Review

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
> Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

## Analysis

The Social Security Administration has promulgated the following regulations which

establish a sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
>
> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. (Tr. 20). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) history of chronic urinary tract infections with incontinence; 2) asthma/chronic obstructive pulmonary disease; 3) depression; 4) fibromyalgia; 5) a history of myocardial infarction; and 6) degenerative joint disease of the back, neck and right shoulder (Tr. 20). In completing step three, however, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 21).

The ALJ then proceeded with step four of his analysis and determined that Plaintiff was able to perform her past relevant work as a security guard (Tr. 27). In making this determination, the ALJ relied upon the testimony of a vocational expert ("VE") (Tr. 27). Based on these findings, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision.

(Tr. 27-28). In making these determinations the ALJ cited substantial evidence, a summary of which now follows.

Plaintiff was examined by Dr. Thomas Florian on April 17, 2000 (Tr. 210). Dr. Florian indicated that Plaintiff had previously been diagnosed with fibromyalgia, and he further noted that this diagnosis was "fairly convincing" (Tr. 211).

On May 2, 2001, Plaintiff was treated at the Southeastern Regional Medical Center Emergency Room based on complaints of chest pain (Tr. 212-226). This pain appeared to be caused by a problem in the chest wall (Tr. 212). An x-ray of Plaintiff's chest was normal and a lung scan revealed no evidence of pulmonary embolism (Tr. 226). She was instructed to rest as much as possible for two to three days (Tr. 212).

Southeastern Regional Medical Center Emergency Room provided treatment for Plaintiff again on December 19, 2001 when she repeated her complaints of chest pain (Tr. 227-242). Once again, an x-ray of Plaintiff's chest was normal (Tr. 242). Plaintiff also had a sore throat (Tr. 227). She was diagnosed with a muscle strain (Tr. 227).

Plaintiff was diagnosed with pneumonia on January 20, 2002 (Tr. 243). She was given an antibiotic injection (Tr. 243). In addition, Plaintiff was prescribed Erythromycin and an inhaled bronchodilator (Tr. 243-244).

From January 28, 2002 until July 2, 2002 Plaintiff received treatment from the North Carolina Division of Medical Assistance, Department of Social Services (Tr. 253-268). On January 28, 2002, Plaintiff stated that she was able to control her fibromyalgia symptoms with over the counter analgesics and by watching her activity level (Tr. 260). It was also noted that Plaintiff had previous been treated for "depression that arose from the fibromyalgia" (Tr. 260). During a July 15,

4

2002 examination Plaintiff had no complaints other than: 1) a history of asthma; 2) persistent bronchitis; and 3) pelvic pain (Tr. 258). Plaintiff was diagnosed with: 1) depression; 2) asthma; 3) hyperlipidemia; 4) hypertension; and 5) a right ovarian cyst (Tr. 257). When she was examined on June 2, 2003, Plaintiff was assessed with: 1) uncontrolled hypertension; 2) financial barriers to obtaining medication; and 3) depression (Tr. 256). Otherwise, Plaintiff had no complaints (Tr. 256). On June 16, 2003, Plaintiff reported that she was not in any pain (Tr. 255). Furthermore, it was noted that Plaintiff recently underwent cardiac testing (Tr. 255). The results of these tests were generally negative (Tr. 255). Plaintiff had no new complaints during her June 16, 2003 examination (Tr. 255). Plaintiff was diagnosed with persistent bronchitis on June 11 and June 25, 2002 (Tr. 254). Finally, an x-ray of Plaintiff's chest taken on June 27, 2002 revealed no evidence of acute cardiopulmonary disease (Tr. 267, 282).

The Southeastern Regional Medical Center Emergency Room provided treatment for Plaintiff on May 31, 2002 (Tr. 269-280). She complained of moderate dyspnea and a history of asthma (Tr. 278). Plaintiff was discharged on June 1, 2002 with no further aftercare instructions other than to use medicine as prescribed (Tr. 280).

Plaintiff was examined at the New Hanover Regional Medical Center on November 8, 2002 (Tr. 298). She was diagnosed with bronchitis (Tr. 298). On May 12, 2003, Plaintiff was examined based on her complaints of myalgias (Tr. 286). She denied: 1) arthralgias; 2) fevers; 3) chills; 4) chest pain; 5) shortness of breath; 6) vision changes; 7) headache; 8) abdominal pain; and blood in her stool or urine (Tr. 286). Likewise, Plaintiff's hypertension and asthma were described as "controlled" (Tr. 287). Her myalgias was attributed to Zocor and therefore her use of that medication was discontinued (Tr. 287).

5

On August 13, 2003, Plaintiff was examined by Dr. Douglas Jenkins (Tr. 309-311). Plaintiff complained of chronic low back pain which radiated into the hip bilaterally (Tr. 309). She noted that this pain was aggravated by walking, standing, or bending (Tr. 309). According to Plaintiff she could walk approximately one to two blocks before she experienced any shortness of breath (Tr. 309). In addition, Plaintiff stated she suffered from fibromyalgia as well as pain and limited range of motion of her joints (Tr. 309). It was also observed that Plaintiff had a history of depression (Tr. 310). Plaintiff was able to ambulate in and out of the office without assistance (Tr. 310). Likewise, she was able to get on and off the exam table as well as dress and undress without difficulty (Tr. 310). Her straight leg raising was negative bilaterally and no spasms or tenderness were noted in the paralumbar area (Tr. 310). She was able to bend and squat without difficulty (Tr. 310). The strength in her upper and lower extremities was 5/5 (Tr. 311). Ultimately, Plaintiff was diagnosed with: 1) chronic low back strain; 2) hypertension by history; and 3) asthma by history (Tr. 311). However, Dr. Jenkins described Plaintiff's fibromyalgia as "suspect" and stated that Plaintiff's depression was "controlled" (Tr. 311).

The Columbus County Hospital Emergency Department provided treatment for Plaintiff on August 31, 2002 based on her complaints of abdomen pain (Tr. 312-326). She was also having difficulty breathing (Tr. 312). Diagnostic examinations indicated that Plaintiff's lungs were clear and well aerated (Tr. 324).

Plaintiff received treatment at the New Hanover Regional Medical Center Emergency Room beginning on September 2, 2002 (Tr. 327-335). She again complained of moderate abdominal pain, as well as nausea and vomiting (Tr. 327, 329). Plaintiff was discharged in stable condition on September 3, 2002 (Tr. 328).

On October 23, 2002 Plaintiff underwent a colonoscopy and a biopsy of a rectal polyp (Tr. 336). Her colon was essentially normal (Tr. 336). Plaintiff tolerated the procedure well and there were no complications (Tr. 337).

The Columbus County Hospital Emergency Department again provided treatment for Plaintiff on March 18 and 19, 2003 based on her complaints of back pain (Tr. 367-396). Diagnostic examination revealed: 1) that Plaintiff's vertebral body height was within normal limits; 2) a slight narrowing of the L5-S1 disc space; 3) no evidence of fracture or subluxation; 4) no paraspinous mass; 5) minimal degenerative changes; and 6) no acute osseous abnormality (Tr. 384). Other than the slight narrowing at L5-S1, all remaining disc space was preserved (Tr. 384).

Plaintiff was admitted to Columbus County Hospital from March 27, 2003 until March 31, 2003 based on her complaints of urinary stress incontinence (Tr. 397-409). She underwent a cystourethral suspension and cystoscopy (Tr. 399). Postoperatively, she was described as "doing well" (Tr. 397). It was also noted that she was ambulating well (Tr. 397).

Southeastern Regional Medical Center provided treatment for Plaintiff from June 5, 2003 until June 13, 2003 (Tr. 622-702). Plaintiff presented with a three to four day history of substernal chest pain, shortness of breath, nausea and lightheadedness (Tr. 622). She was diagnosed with: 1) unstable angina; 2) uncontrolled hypertension; 3) iron-deficiency anemia; 4) Hypertriglyceridemia; and 5) anxiety and depression (Tr. 622).

Dr. William Link conducted a comprehensive clinical psychological evaluation of Plaintiff on July 15, 2003 (Tr. 703-705). During this examination, Plaintiff stated that she typically stays in bed most of the day (Tr. 704). Plaintiff also asserted that she was not able to read due to diminished concentration (Tr. 704). However, she was able to walk to the office without difficulty and sat down

7

easily in her chair (Tr. 704). Ultimately she was diagnosed with "Major Depressive Disorder, recurrent" (Tr. 705). Dr. Link Stated that: 1) Plaintiff could understand and follow through on basic and routine instructions; 2) Plaintiff's social interactions were appropriate; 3) Plaintiff demonstrated mild agoraphobic tendencies; 4) Plaintiff's reasoning and judgment were adequate; and 5) Plaintiff did not have any difficulties with personal care (Tr. 705). No difficulties were noted in her gait nor her sitting and rising (Tr. 705). Finally, Dr. Link opined that Plaintiff could mange funds in her best interest (Tr. 705).

Plaintiff underwent a sleep study on July 23, 2003 (Tr. 706-720). She was diagnosed with: 1) snoring disorder; 2) periodic leg movement disorder; and 3) decreased sleep efficiency (Tr. 713). There was no evidence for obstructive or central apnea or hypopnea (Tr. 713).

On September 10, 2003 Plaintiff was treated for a urinary tract infection at Southeastern Regional Medical Center (Tr. 721-735). Antibiotics were prescribed and Plaintiff was discharged in satisfactory condition (Tr. 721, 733).

An assessment of Plaintiff's physical residual functional capacity ("RFC") was conducted on October 2, 2003 (Tr. 778-785). It was determined that Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight hour workday; and 5) push and/or pull with no limitations other than those already noted for lifting and carrying (Tr. 779). Furthermore, Plaintiff was deemed capable of only occasionally climbing and crouching (Tr. 780). Plaintiff was assessed as being able to frequently balance, kneel and crawl (Tr. 780). No manipulative, visual or communicative limitations were noted (Tr. 781-782). Finally, it was noted that Plaintiff should avoid concentrated exposure

8

to extreme cold and hazards such as machinery and heights (Tr. 782).

Dr. Arlene Cooke evaluated Plaintiff's mental RFC on October 7, 2003 (Tr. 760-777). She stated that Plaintiff was moderately limited in her ability to: 1) carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and 5) respond appropriately to changes in the work setting (Tr. 760-761). Plaintiff was not significantly limited in all other rated areas (Tr. 760-761). In addition, Dr. Cooke stated that Plaintiff could: 1) understand and remember simple and some detailed instructions; and 2) maintain the level of attention and concentration needed to perform "simple routine repetitive tasks" ("SRRT's") (Tr. 762). However, Dr. Cooke also opined that Plaintiff would have difficulty interacting appropriately with coworkers and with the general public (Tr. 762). Ultimately it was concluded that Plaintiff could perform SRRT's in a low production environment with minimal "people contact" (Tr. 762). Furthermore, Dr. Cooke stated that Plaintiff's impairments did not precisely satisfy the diagnostic criteria for Listing 12.04 (Tr. 767). Plaintiff was assessed as having mild restrictions in her activities of daily living (Tr. 774). With regard to maintaining social functioning and maintaining concentration, persistence or pace, Plaintiff was described as having moderate limitations (Tr. 774). No episodes of decompensation were recorded (Tr. 774). Finally, evidence did not establish the presence of the "C" criteria of the Listings (Tr. 775).

Plaintiff reported to the Southeastern Medical Center Emergency Room on February 10, 2004 complaining of substernal chest pain (Tr. 786-847). A chest CT revealed no acute process (Tr.

9

805). An air contrast upper G.I. series was normal (Tr. 806). Likewise, a myocardial perfusion study revealed no: 1) evidence of reversible ischemia; or 2) focal wall motion abnormalities (Tr. 807). Plaintiff demonstrated a left ventricular ejection fraction of 73 percent (Tr. 807). In addition, Plaintiff underwent a abdominal ultrasound, which was normal (Tr. 808). X-ray's of Plaintiff's chest yielded normal results (Tr. 809). Other x-rays indicated: 1) no acute cardiopulmonary disease; 2) borderline cardiomegaly; and 3) mild thoracic spondylosis (Tr. 810). Plaintiff was discharged on February 13, 2004 (Tr. 847).

On March 21, 2004 Plaintiff returned to the Southeastern Medical Center Emergency Room (Tr. 848-857). She stated that she had been struck in the nose (Tr. 850). X-rays indicated that Plaintiff's nasal structures and soft tissues were within normal limits (Tr. 849).

Another assessment of Plaintiff's physical RFC was conducted on September 7, 2004 (Tr. 752-759). It was determined that Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight hour workday; and 5) push and/or pull with no limitations other than those already noted for lifting and carrying (Tr. 753). Furthermore, Plaintiff was deemed capable of only occasionally climbing (Tr. 754). It was stated that she should never be required to balance (Tr. 754). Plaintiff was assessed as being able to frequently kneel, crouch and crawl (Tr. 754). No manipulative, visual or communicative limitations were noted (Tr. 754-755). Finally, it was noted that Plaintiff should avoid concentrated exposure to: 1) fumes, odors, dusts, gases and poor ventilation; and 2) hazards such as machinery and heights (Tr. 756).

Dr. W. Albertson evaluated Plaintiff's mental RFC on October 19, 2004 (Tr. 737-751). He

stated that Plaintiff's impairments did not precisely satisfy the diagnostic criteria for Listing 12.04 (Tr. 740). Plaintiff was assessed as having no restrictions in her activities of daily living (Tr. 747). With regard to maintaining social functioning and maintaining concentration, persistence or pace, Plaintiff was described as having mild limitations (Tr. 747). One or two episodes of decompensation were recorded (Tr. 747). Evidence did not establish the presence of the "C" criteria of the Listings (Tr. 748). Ultimately, Dr. Albertson opined that Plaintiff's depression was not a severe impairment (Tr. 751).

Plaintiff was admitted to Southeastern Regional Medical Center from December 14, 2005 until December 16, 2005 (Tr. 858-917). She presented to the emergency room with complaints of vomiting and diarrhea for a few days (Tr. 858). While admitted, Plaintiff had an episode of chest pain, so an echocardiogram and cardiac enzymes were ordered (Tr. 858). Ultimately, Plaintiff was diagnosed with: 1) acute coronary syndrome; 2) gastroenteritis; 3) hypertension; 4) dehydration; 5) anemia; 6) chronic obstructive pulmonary disease; 7) diabetes mellitus, type 2; 8) leukocytosis; and 9) renal insufficiency (Tr. 858). Before Plaintiff could receive treatment from the cardiology department, Plaintiff left against medical advice (Tr. 858).

Plaintiff underwent a left heart catheterization on December 16, 2005 (Tr. 918-953). She initially reported with gastrointestinal upset and some chest discomfort (Tr. 918). Dr. Patrick Simpson stated:

> Subsequent catheterization revealed that she had a left dominant system, but she had a right coronary artery which was subtotaled. I expect that this caused a non-Q wave myocardial infarction. Again, because this was a non-dominant vessel, it was elected to treat this medically. She did well with no further chest discomfort or shortness of breath.
> (Tr. 918).

While admitted, Plaintiff's diabetes was under reasonable control (Tr. 918). It was noted that "her

11

labs came back basically towards normal" (Tr. 924).  Upon discharge, Plaintiff was diagnosed with: 1) Non-Q wave myocardial infarction due to non-dominant right coronary infarct; 2) coronary artery disease; 3) diabetes; and 4) irritable bowel syndrome (Tr. 918).

On January 3, 2006, Plaintiff was admitted  to University of North Carolina Hospital in Chapel Hill (Tr. 953).  Her primary complaint was chest pain (Tr. 953).  Upon discharge she was instructed to appear for two follow up appointments (Tr. 953).

From June 4, 2003, until April 7, 2006, University of North Carolina Hospitals provided treatment for Plaintiff (Tr. 410-621).  On June 4, 2003, Plaintiff was diagnosed with recurrent stress urinary incontinence (Tr. 540).  Plaintiff was similarly diagnosed with severe urinary incontinence on July 11, 2003 (Tr. 532).   Furthermore, it was indicated that Plaintiff possibly had a small cystic mass at the vaginal cuff (Tr. 532).  On September 24, 2003, Plaintiff was diagnosed a 1-2 mm nonobstructing right intrarenal calculus (Tr.  604).  It was also noted that Plaintiff had undergone a hysterectomy (Tr. 604).  A x-ray of Plaintiff's chest taken on May 19, 2004 revealed: 1) mild degenerative changes in the thoracic spine with hypertrophic osteophyte formation at multiple levels; 2) narrowing of the intervertebral disc spaces; 3) that Plaintiff's cardiac silhouette was within normal limits for size and contour; and 4) no focal infiltrates or effusions (Tr. 602).  Plaintiff stated on June 9, 2004 that her asthmatic bronchitis was doing better (Tr. 521).  Likewise, the examining physician noted that all her "other problems [were] stable" (Tr. 522).  A transurethral collagen injection was performed on June 15, 2004 to treat Plaintiff's urinary incontinence (Tr. 534). Plaintiff tolerated this procedural well, and marked improvement was noted (Tr. 535). Dr. Wayne Woodyear stated on July 8, 2004 that Plaintiff chronic obstructive pulmonary disease was worsening (Tr. 520).   He also observed that Plaintiff continued to suffer from hypertension and depression (Tr.

12

520).  Her other medical problems were stable on this date (Tr. 520).  During a October 11, 2004 examination, Plaintiff stated that she suffered from a constant ache in her shoulders, arms and legs (Tr. 503).   Plaintiff stated on August 13, 2004 that her urinary incontinence was remarkably improved (Tr. 512).  On September 7, 2004, Plaintiff indicated that a home nebulizer was helping her breathing Tr. 509).  However, she still complained of depression and joint pain (Tr. 510).  She repeated her complaints of muscle weakness and pain on November 9, 2004 (Tr. 502).  During a February 1, 2005 examination, Plaintiff stated that her depression had improved (Tr. 492).  Plaintiff's hypertension was also well controlled at this time (Tr. 493).  Dr. Woodyear diagnosed Plaintiff with hypertension and depression on March 14, 2005 (Tr. 491).  He added that all of Plaintiff's other condition were stable (Tr. 491).  During a April 15, 2005 evaluation Dr. Woodyear stated that Plaintiff was "obviously in pain in her arms, legs and back" (Tr. 485).  Plaintiff was described as "doing fairly well as far as depression" on May 5, 2005 (Tr. 481).  Similarly, Plaintiff's symptoms others than pain and depression were again described as "stable" (Tr. 482).  On May 16, 2005, studies indicated that Plaintiff did not have an acute fracture or dislocation in her right shoulder (Tr. 573).  Some mild degenerative spurring and osteophytcsis were observed, however (Tr. 573).  There was also some mild narrowing of the acromial humeral interval (Tr. 573).  The studies indicated that Plaintiff did not have an acute fracture, dislocation or joint effusion in her left knee (Tr. 573).   Mild joint space narrowing was noted at the medial compartment (Tr. 573).  This narrowing was compatible with mild osteoarthrosis (Tr. 574).   On May 20, 2005, Plaintiff was diagnosed with diabetes mellitus without diabetic retinopathy (Tr. 475).  Several of Plaintiff's conditions were again described as "stable" on June 8, 2005 (Tr. 471).  She was prescribed metformin for her diabetes (Tr. 467).  Dr. Collin Hall stated on June 10, 2005 that despite Plaintiff

13

complaints of pain her functional ability had not appeared to have changed markedly (Tr. 499). In addition, Dr. Hall also stated that he did not see any evidence of a neuromuscular disease (Tr. 499). Plaintiff stated on June 22, 2005 that she was feeling better (Tr. 464-465). Electromyography studies completed on July 20, 2005 were normal and did not demonstrate evidence of a large fiber peripheral neuropathy (Tr. 593-594). Dr. Ajmal Gilani examined Plaintiff on August 15, 2005 (Tr. 458-460). During this examination, Plaintiff complained of aches in her arms and legs (Tr. 458). However, she also stated that "[s]he does not feel weak" (Tr. 458). Dr. Giliani opined that based on Plaintiff's symptoms "myopathy does not seem to be a strong possibility" (Tr. 459). Plaintiff was advised to consider a rheumatological opinion for management of her fibromyalgia (Tr. 459). On that same day, Plaintiff was also examined by Dr. Woodyear (Tr. 455-457). After this examination, Plaintiff was diagnosed with: 1) persistent severe leg pain; 2) urinary tract infection; 3) diabetes; and 4) depression (Tr. 456). However, Dr. Woodyear further stated that Plaintiff's: 1) diabetes was fairly well controlled "until the last couple of weeks"; 2) depression was well treated; and 3) other problems were stable (Tr. 456). Plaintiff was diagnosed with plantar fasciitis, diabetes with burning foot syndrome and neuropathy on November 8, 2005 (Tr. 448). Dr. Hao Wang stated on November 28, 2005 that Plaintiff had undergone "2 EMG studies which were unremarkable" (Tr. 444). He also noted that Plaintiff demonstrated no signs of myopathy, peripheral neuropathy, or carpal tunnel syndrome (Tr. 444). Upon examination, Plaintiff had full muscle strength in her extremities (Tr. 445). Studies conducted on December 2, 2005 revealed degenerative disc disease, although no acute abnormality was seen in the cervical or lumbar spine (Tr. 572). During a January 3, 2006 examination, Dr. Woodyear observed that Plaintiff suffered a myocardial infarction on or about December 15, 2005 (Tr. 440). She was now having unstable angina presenting itself as abdominal

pain, chest pain, and diarrhea (Tr. 441). The angina did respond to nitroglycerin (Tr. 441). On January 3, 2006, a x-ray of Plaintiff's chest reveal no focal infiltrate or consolidation (Tr. 567). After Plaintiff underwent a cardiac regional perfusion on January 4, 2006, it was determined she had normal left ventricular wall motion and function at rest (Tr. 566). No fixed or reversible defects were observed and there was no evidence of ischemia (Tr. 566). An electrocardiogram revealed that Plaintiff had normal sinus rhythm (Tr. 550). Plaintiff also had full range of motion in all four extremities and her irritable bowel syndrome symptoms were well controlled (Tr. 562-563). Ultimately, Plaintiff was advised to change her diet and exercise more frequently (Tr. 547). Furthermore, Dr. Dr. Woodyear opined that Plaintiff was "now having what sounds like at least unstable angina . . . which presents first as abdominal pain and diarrhea and then chest pain" (Tr. 1026) Likewise, during a January 12, 2006 examination Dr. Woodyear indicated that Plaintiff's December, 2005 episode might actually have had "a non-cardiac etiology" (Tr. 437). Dr. Woodyear completed a form questionnaire assessing Plaintiff's physical RFC on January 16, 2006 (Tr. 1018-1023). According to this form Plaintiff: 1) was constantly in pain sufficient to interfere with her attention and concentration; 2) was severely limited in her ability to deal with work stress; 3) could neither sit nor stand for any length of time; 4) was unable to walk; 5) was unable to work; 6) could never lift any amount of weight; 7) had significant limitations with regard to reaching, handling or fingering; and 8) was incapable of bending or twisting (Tr. 1018-1023). On January 23, 2006, Plaintiff was diagnosed with: 1) recent acute MI; 2) diabetes; 3) hypertension; 4) hyperlipidemia; 5) depression; and 6) increase in edema with no evidence of congestive heart failure (Tr. 435). Her other problems were again described as stable, as was her depression (Tr. 435). Plaintiff underwent an echocardiogram on February 3, 2006 (Tr. 543). It was concluded that Plaintiff's echocardiogram

15

results were normal (Tr. 426, 544). Dr. Woodyear stated on February 3, 2006 that Plaintiff's chronic chest pain was of uncertain etiology (Tr. 422). Furthermore, during an exam conducted that day, Plaintiff did not have any complaints other than chest pain, palpitations, and lower extremity swelling (Tr. 421-422). On March 16, 2006, Dr. Anthony Visco stated that Plaintiff was currently stable three months after suffering a myocardial infarction (Tr. 419). Plaintiff also indicated that her stress incontinence was not as severe as it had been in the past (Tr. 419).Dr. Wang stated on March 20, 2006 that Plaintiff had degenerative change in the cervical and lumbar spine (Tr. 416). He prescribed Tylenol and home exercise (Tr. 416). He also advised Plaintiff to lose weight (Tr. 416). Again on April 7, 2006, Dr. Woodyear stated that Plaintiff was "without complaints" other than chest pain and shortness of breath (Tr. 410-411). The etiology of Plaintiff's chest pain remained uncertain (Tr. 412).

The ALJ made the following findings with regard to Dr. Woodyear's January 16, 2006 RFC determination:

> As for the opinion evidence, the undersigned is cognizant that Dr. Woodyear completed a questionnaire on January 16,2006, in which he indicated that the claimant was basically unable to perform even sedentary work activity due to the following: a recent heart attack; depression (with a history of suicide attempt in 1992); diabetes; lung disease; severe muscle pain; gastroesophageal reflux disease/dyspepsia/dysphagia; anemia; chest pain; frequent urinary tract infections; and hyperlipidemia (Exhibit 31 F) However, his opinion is not supported by the medical evidence of record including his own treatment notes. Specifically, he described the claimant as only "somewhat" depressed when seen on July 6, 2004. Hr only other complaint was an earache. Also, on July 15,2004, he indicated that despite her complaints of breathing problems, the claimant's lungs were clear and examination of her heart normal. The claimant was without edema to her extremities and Dr. Woodyear encouraged her to walk. The claimant complained of pain allover when treated on October 11, 2004, but a nerve conduction study proved to be normal and physical examination revealed showed normal bulk and tone to her limbs as well as intact reflexes. On November 9, 2004, the physician noted that the claimant was well-appearing

and her physical examination within normal limits other than an elevated blood pressure reading. Additionally, Dr. Wu reported earlier in May of 2004, that the claimant was not disabled. Dr. Woodyear noted on May 6,2005, that the claimant's only problems were chronic pain, left knee pain and depression and that her other problems were stable. Plus, physical examination revealed full range of motion to her extremities except for an inability to raise her right upper extremity. Furthermore, the physician described Ms. Smith as well appearing when seen on May 16,2005. Additionally, one of Dr. Woodyear's colleagues at the. University of North Carolina Hospitals indicated on May 19, 2005, that the claimant revealed 4/5 strength to her right shoulder as well as 5/5 to her other extremities. On August 15, 2005, Dr. Woodyear reported that the claimant's depression was "well treated", that her lungs were clear to auscultation and percussion, and her heart rate and rhythm regular. The physician described the claimant as in no acute distress and "stable-appearing" when seen on October 3,2005. (Exhibit 19F) Additionally, Dr. Woodyear did not apparently offer his medical opinion as to the claimant's functioning level on his own initiative, but rather offered them at the request of the claimant and the claimant's legal representative. Furthermore, the medical opinion was supplied using check-off forms apparently supplied by the claimant's representative. The use of such forms, when considered in conjunction with the treating relationship between Dr. Woodyear and the claimant can be seen as leading toward a "disabled" conclusion and the undersigned is aware that as a result of such a relationship, Dr. Woodyear would be motivated to complete such forms in a manner most beneficial to the claimant. Therefore, for the reasons cited above, the undersigned has afforded only minimal weight to the opinion of Dr. Woodyear.

Following the ALJ's decision on December 6, 2006, Plaintiff's counsel submitted additional evidence covering the period from May 9, 2006, through the date of the decision (Tr. 1039-1184). These records relate to Plaintiff's coronary artery bypass grafting on May 26, 2006, and her general health in the months following that procedure. Prior to the surgery, Plaintiff was suffering from acute coronary syndrome resulting from an obstruction in her left anterior descending (Tr. 1108). She was referred for urgent surgical myocardial revascularization (Tr. 1108)

On May 26, 2006, Dr. Brett Sheridan grafted an artery from Plaintiff's left lower extremity to bypass the obstruction (Tr. 1107-1109). Plaintiff was discharged on June 1, 2006, at which time

Dr. Matthew Sherrill stated that Plaintiff "was doing well at the time of discharge, she was ambulating without assistance, her pain was controlled, she was tolerating regular diet and she was subsequently discharged home" (Tr. 1088). Furthermore, Dr. Sherrill also opined that Plaintiff could resume normal activity, which included lifting up to twenty pounds (Tr. 1088).

On June 14, 2006, three weeks after the coronary artery bypass grafting, Plaintiff's physician noted that she "has been progressing nicely since surgery" (Tr. 1069). While Plaintiff reported some mild shortness of breath when ambulating, her physician remarked that she was in "no acute distress" (Tr. 1069, 1070). Indeed, Plaintiff was "encouraged to remain as active as possible and walk everyday" (Tr. 1070).

Dr. Woodyear examined Plaintiff on June 26, 2006. He stated that plaintiff was doing "fairly well" post surgery and that she was in "no acute distress" (Tr. 1066, 1067). Dr. Woodyear also noted that Plaintiff was "[d]oing well from a depression standpoint" and that her lung disease was "stable" (Tr. 1068). Plaintiff returned to see Dr. Woodyear on July 12, 2006 (Tr. 1063). Dr. Woodyear noted that Plaintiff was still healing from surgery and that her heart sounded regular (Tr. 1064). He also stated that Plaintiff's pain was "much better on Ultram" and that her depression was still "doing fairly well" (Tr. 1064).

On August 3, 2006, Dr. Woodyear stated that Plaintiff was experiencing chest pain and that he was "worried about" Plaintiff (Tr. 1059-1060).

Plaintiff was re-examined by Dr. Sheridan on July 12, 2006 (Tr. 1061). Dr. Sheridan remarked that Plaintiff was progressing since the surgery (Tr. 1061) Moreover, Plaintiff denied having chest pain and shortness of breath at rest or with activity (Tr. 1061). Her vital signs were stable and her pulse was regular (Tr. 1061). Dr. Sheridan deferred a chest x-ray and

electrocardiogram (Tr. 1061).

On August 10, 2006, Plaintiff was examined by Dr. Carla Dupree and Dr. Sanjeev Shah (Tr. 1052). Plaintiff denied any side effects with any of the medications she was taking (Tr. 1053). It was noted that Plaintiff's blood pressure was under good control and at goal (Tr. 1055). Plaintiff remarked that her chest pain is "90% improved" following the coronary artery bypass grafting (Tr. 1055). In addition, Plaintiff's sinus rhythm was normal (Tr. 1056). However, Plaintiff did indicate that she experienced some degree of angina during rest and exertion (Tr. 1053).

Dr. Woodyear examined Plaintiff again on October 30, 2006, (Tr. 1049). He noted that there was no evidence of ischemia (Tr. 1049). Furthermore, Dr. Woodyear indicated that Plaintiff was "definitely doing better" and that "[t]he only thing really bothering her is that she says that her mouth is very dry" (Tr. 1050). Similarly, Dr. Woodyear stated that Plaintiff was "doing well as far as her depression" and that she was "having less of her symptoms of chest discomfort" (Tr. 1050). Dr. Woodyear indicated that Plaintiff should return for a follow up in two months (Tr. 1051).

On December 7, 2006, Plaintiff was examined again by Dr. Dupree and Dr. Shah (Tr. 1044). Plaintiff's blood pressure was "under good control and at goal" (Tr. 1047). She denied any side effects from her current medications (Tr. 1045). In addition, Plaintiff stated that her chest pain is "90% improved" post coronary artery bypass grafting (Tr. 1047). However, Plaintiff also indicated that she experienced chest pressure both at rest and exertion (Tr. 1046).

Plaintiff was examined by Dr. Woodyear again on January 8, 2007 (Tr. 1041). Dr. Woodyear remarked that plaintiff "looks the best I have seen her in a long time and said she does not feel bad anymore" (Tr. 1042). However, he also added that Plaintiff "does not feel good either" (Tr. 1042). Upon examination, Dr. Woodyear described Plaintiff as "a much better appearing female" and

"stable" (Tr. 1042). Dr. Woodyear observed that plaintiff's depression "is well controlled" and that "her breathing is good" (Tr. 1042). Plaintiff's diabetes was also well controlled (Tr. 1042-1043).

During the hearing in this matter, Plaintiff testified that she lived alone (Tr. 67). She indicated that she previously worked as a security guard (Tr. 69). According to Plaintiff, her work as a security guard consisted of the following tasks: 1) opening the fence for trucks; 2) inspecting trucks going in and out of the facility; 3) checking employees' badges as they arrived to work; and 4) going around the facility to make sure everything was secure (Tr. 69). Plaintiff stated that she could no longer perform this work because of pain in her neck, back and shoulders, as well as asthma (Tr. 69-70). In addition, she noted that her back and neck problems had gotten worse in the last three years (Tr. 74). Plaintiff testified that she had a rotator cuff tear (Tr. 74). According to Plaintiff, she suffers from: 1) anemia; 2) high blood pressure; 3) asthma; 4) depression; 5) incontinence; and 6) fibromyalgia (Tr. 75-81). She further testified that she experienced several side-effects from the medications she was taking (Tr. 77, 79, 84). Furthermore, Plaintiff indicated that she had to avoid strenuous activity because of her incontinence (Tr. 78). Plaintiff also stated that she has a heart condition (Tr. 80). She testified that her symptoms could be triggered by just walking to the mailbox and back (Tr. 80). With regard to her fibromyalgia, Plaintiff indicated that should could not be touched anywhere without it triggering pain (Tr. 81). Moreover, Plaintiff stated that she was generally in pain at all times (Tr. 82). Plaintiff testified that she could only sit for 30 minutes at a time and only stand for 15 to 20 minutes at a time (Tr. 85-86). Initially, Plaintiff testified that she could not walk for any length of time (Tr. 86). When reminded that she walked into the hearing room, she indicated that she could walk at a steady pace for about 15 minutes (Tr. 86). According to Plaintiff, she could not lift anything heavier than her pocket book–which she

20

estimated weighed about five pounds (Tr. 86-87). Likewise, Plaintiff indicated that she could not

bend, twist, stoop, or kneel (Tr. 87). However, Plaintiff stated that she did her own shopping and

housecleaning (Tr. 88). She did state that not all of her housework "gets done" (Tr. 88).

With regard to Plaintiff's testimony, the ALJ made the following observations:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some of her alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible. Specifically, despite her complaints of adverse side effects from her prescribed medications, the record does not establish that she has made any such complaints to any treating source. As to the allegation that her physician had mandated that she elevate her feet while sitting, the evidence of record does not contain any information to that effect. In fact, her discharge summary following her heart attack in late 2005 indicates that she had been instructed to continue to perform her activities of daily living and activities as tolerated. (Exhibit 30F) Additionally, her description of her pain as being a 7 of 10 and her allegations that she was close to being suicidal are also inconsistent with the information contained in the record. Specifically, Dr. Creighton reported on July 11,2005, that the claimant's reported right shoulder pain was out of proportion With physical findings. Also, Dr. Huggins described the claimant as being in no acute distress without complaints other than intermittent chest pain and occasional shortness of breath when seen in April of 2006. (Exhibit 19F) Moreover, Dr. Royal described the claimant as being in apparent distress upon cardiologic evaluation in June of 2003. (Exhibit 20F) Additionally, the claimant was consistently described as in no apparent distress when treated on numerous occasions at the Lumberton Health Center during the period from January 28, 2002 through June 16, 2003. (Exhibit 5F) Such comments have been considered as directed by Mickles v. Shalala. 29 F. 3d 918 (4th Cir. 1994) given that they indicate conflicts in the claimant's history/statements and detract from her credibility. Also, despite her alleged problems related to depression, the record does not establish that the claimant has sought treatment from a mental health specialist. Also, Dr. Royal described the claimant's mood and affect as normal upon evaluation in June of2003. (Exhibit 20F) Further detracting from the claimant's credibility is the fact that the record establishes that the claimant has a history of non-compliance with regard to her medical treatment. Specifically, it was noted upon the claimant's admission to the hospital in June 01 2003, that the claimant had a history of non-compliance with medications and the undersigned finds it noteworthy that the claimant's blood pressure upon admission was

uncontrolled at 163/81 (with a pulse rate of 89), but had dropped to 129/72 (with a pulse rate of 56) after being treated with medication during her hospital stay. (Exhibit 20F) Additionally, Dr. Woodyear reported in February of 2005, that the claimant was difficult to treat because of her lack of follow-through with respect to his instructions. (Exhibit 19F) As to her complaints regarding fecal and urinary incontinence, the claimant reported to Dr. Wang in March of 2006, that the she was not experiencing any bowel or urinary dysfunction. (Exhibit 19F) Additionally, the undersigned notes that the claimant was able to sit for over an hour (from 9:25 a.m. to 10:50) in order to testify during the hearing without indication of any bowel or bladder problems. The fact that the claimant collected unemployment benefits also detracts from her credibility given that acceptance of unemployment benefits entails an assertion of the ability to work and is facially inconsistent with the claim of disability (See Black v. Apfel, 143 F.3d 383 (8th Circuit, 1998».

(Tr. 24-25).

Based on this evidence, the ALJ made the following findings regarding the severity of Plaintiff's impairments:

Specifically, the claimant's neck, back and right shoulder impairments do not meet the .requirements of Listings 1.02 or 1.04 as they have not resulted in an inability to ambulate effectively or that she has been unable to perform fine and gross movements effectively. Specifically, Dr. Royal reported in June of 2003, that the claimant had a normal gait and muscle strength. (Exhibit 20F) Additionally, Dr. Link reported in July of 2003, that the claimant did not demonstrate any difficulties with her gait and walked easily into his office. Additionally, he noted that the claimant's fine and gross motor skills were intact (Exhibit 21F)

The claimant's heart problems fail to meet the requirements of any of the conditions covered under Listing 5.00 and find that they do not given that they have not resulted in an inability to carry on any physical activity or been characterized by symptoms of inadequate cardiac output, pulmonary congestion or anginal syndrome at rest. Such a finding is supported by the fact that Dr. Huggins reported in April of 2006 that the claimant's chest pain had improved with nitroglycerin, that she had a normal EKG, and that physical examination revealed regular heart rhythm and rate without murmurs, rubs or gallops. (Exhibit 19F)

The undersigned also considered whether the claimant's urinary problems met any impairment as related to Listing 6.00 and finds that they do not given that they are not the result of chronic renal disease but simply chronic urinary

22

tract infections as evidenced by information received from Dr. Woodyear. (Exhibit 31F)

The undersigned also considered whether the claimant's respiratory problems meet Listing 3.02 and finds that they do not as they have not been characterized by the FEVI readings required by that listing. The undersigned also considered whether the condition met the requirements of Listing 3.03 and finds that it does not given that the condition has not been characterized by attacks occurring at least once every two months or at least six times a year. In fact, the claimant testified that she had not required emergency room treatment for the condition since 2001 or 2002 and that the condition had never necessitated hospital admission.

Also, the undersigned notes that while fibromyalgia does not have its own listing, after thoroughly reviewing all of the listings relevant to the claimant's complaints of back, neck and right shoulder pain, the undersigned has also found that the claimant's fibromyalgia does not medically equal any listing contained in the Listing of Impairments. Specifically, the claimant's fibromyalgia has not caused major dysfunction of any of her joints as set forth in Listing 1.02 nor has it resulted in any disorder of the spine as required by Listing 1.04. The claimant's depression fails to meet the requirements of Listing 12.04 inasmuch as the condition has not resulted in a marked limitation relative to two of the following areas of functioning: activities of daily living; social functioning; and concentration, persistence or pace. Moreover, the impairment has not resulted in repeated episodes of decompensation of extended duration.
(Tr. 21-22).

In addition, the ALJ made the following finding with regard to Plaintiff's RFC:

the claimant has the residual functional capacity for work involving lifting/carrying ten pounds frequently and twenty pounds occasionally as well as standing, walking and sitting six hours each in an eight-hour workday. The claimant is completely restricted from climbing ladders, scaffolds and ropes and can only occasionally perform the following postural activities: climbing, balancing, stooping, stooping, kneeling, crouching and crawling. The claimant is further restricted from more than occasional reaching overhead with her right upper extremity and from concentrated exposure to temperature extremes and fumes. Additionally, the claimant is restricted to work requiring no more than three-step task functions with only low stress thus low production work with only occasional contact with the public.

23

(Tr. 23).

Finally, a VE testified during the hearing in this matter that Plaintiff could perform her past relevant work as a security guard as she previously performed it (Tr. 107).

The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's argument relies primarily on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, her claims are without merit. The undersigned will nonetheless address portions of Plaintiff's specific assignments of error.

### The Appeals Council's alleged failure to review new and additional evidence

Plaintiff claims that the Appeals Council erred by failing to review new and additional evidence submitted by Plaintiff (DE-20, pg. 15). In denying review of the ALJ's decision, the Appeals Council stated that it considered the additional evidence submitted by Plaintiff's counsel (Tr. 6). In addition, the Appeals Council noted that Plaintiff underwent coronary artery bypass surgery on May 26, 2006, and stated that Plaintiff had "recovered well from this procedure" (Tr. 7). The Appeals Council also noted that "[a] chemically-induced stress-test administered on August 29, 2006 was normal" (Tr. 7).

24

Plaintiff argues that the Appeals Council was required under 20 C.F.R. §§ 404.970 and 416.14706 to articulate its assessment of this medical evidence and that failure to do so is grounds for reversal. In support of her argument, Plaintiff relies on <u>Harmon v. Apfel</u>, 103 F. Supp.2d 869 (D.S.C. 2000). However, this district has specifically rejected approach adopted in <u>Harmon</u>.  <u>King v. Barnhart</u>, 415 F. Supp.2d 607 (E.D.N.C., March 31, 2005).  In <u>King</u>, this Court concluded that the:

> proper course of action is to consider the entire administrative record, including the new evidence received by the Appeals Council, and determine if the decision of the ALJ was supported by substantial evidence.
> <u>King</u>, 415 F.Supp. 2d at 612.

The new evidence submitted by Plaintiff has already been summarized and has been considered by the undersigned.  The ALJ's determination is still supported by substantial evidence, even in light of this new material.  Accordingly, this assignment of error is meritless.

**<u>Plaintiff's ability to return to her past work as a security guard</u>**

Plaintiff also argues that the finding that she can return to her past work as a security guard is not supported by the evidence (DE-20, pg. 19).  In making this argument, Plaintiff argues at length that she cannot perform this work as it currently exists in the national economy.  However, Plaintiff's argument fails to address the fact that there is substantial evidence that Plaintiff can perform her past relevant work as she performed it.   Under the fourth step of the disability inquiry, a claimant will be not found  disabled if she is capable of performing her past relevant work either as she performed it in the past or as it is generally required by employers in the national economy.  <u>Pass v. Chater</u>, 65 F.3d 1200, 1207 (4th Cir. 1995); SSR 82-61.  Thus, if  an ALJ finds that an individual is able to "perform his job as he did in the past, it is unnecessary to consult the DOT in order to determine whether [the claimant] would be able to perform his past relevant work as it

currently exists in he national economy." <u>Pass</u>, 65 F.3d at 1207. Because there is substantial evidence that Plaintiff can perform her past relevant as she performed it, this assignment of error is meritless.

## Conclusion

For the reasons discussed above, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings [DE-19] be DENIED, that Defendant's Motion for Judgment on the Pleadings [DE-26] be GRANTED, and that the final decision by Defendant be AFFIRMED..

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 5th day of May, 2010.

_____
William A. Webb
U.S. Magistrate Judge